Jury Nullification
by Doug Linder (2001)

*INTERNATIONAL CASES and Jury Nullification*

### What is jury nullification?

Jury nullification occurs when a jury returns a verdict of "Not Guilty" despite its belief that the defendant is guilty of the violation charged. The jury in effect *nullifies* a law that it believes is either immoral or wrongly applied to the defendant whose fate they are charged with deciding.

### When has jury nullification been practiced?

The most famous nullification case is the 1735 trial of John Peter Zenger, charged with printing seditious libels of the Governor of the Colony of New York, William Cosby. Despite the fact that Zenger clearly printed the alleged libels (the only issue the court said the jury was free to decide, as the court deemed the truth or falsity of the statements to be irrelevant), the jury nonetheless returned a verdict of "Not Guilty."

Jury nullification appeared at other times in our history when the government has tried to enforce morally repugnant or unpopular laws. In the early 1800s, nullification was practiced in cases brought under the Alien and Sedition Act. In the mid 1800s, northern juries practiced nullification in prosecutions brought against individuals accused of harboring slaves in violation of the Fugitive Slave Laws. And in the Prohibition Era of the 1930s, many juries practiced nullification in prosecutions brought against individuals accused of violating alcohol control laws.

More recent examples of nullification might include acquittals of "mercy killers," including Dr. Jack Kevorkian, and minor drug offenders.

### Do juries have the right to nullify?

Juries clearly have the power to nullify; whether they also have the right to nullify is another question. Once a jury returns a verdict of "Not Guilty," that verdict cannot be questioned by any court and the "double jeopardy" clause of the Constitution prohibits a retrial on the same charge.

Early in our history, judges often informed jurors of their nullification right. For example, our first Chief Justice, John Jay, told jurors: "You have a right to take upon yourselves to judge [both the facts and law]." In 1805, one of the charges against Justice Samuel Chase in his impeachment trial was that he wrongly prevented an attorney from arguing to a jury that the law should not be followed.

Judicial acceptance of nullification began to wane, however, in the late 1800s. In 1895, in *United States v Sparf*, the U. S. Supreme Court voted 7 to 2 to uphold the conviction in a case in which the trial judge refused the defense attorney's request to let the jury know of their nullification power.

Courts recently have been reluctant to encourage jury nullification, and in fact have taken several steps to prevent it. In most jurisdictions, judges instruct jurors that it is their duty to apply the law as it is given to them, whether they agree with the law or not. Only in a handful of states are jurors told that they have the power to judge both the facts and the law of the case. Most judges also will prohibit attorneys from using their closing arguments to directly appeal to jurors to nullify the law.

Recently, several courts have indicated that judges also have the right, when it is brought to their attention by other jurors, to remove (prior to a verdict, of course) from juries any juror who makes clear his or her intention to vote to nullify the law.

### If jurors have the power to nullify, shouldn't they be told so?

That's a good question. As it stands now, jurors must learn of their power to nullify from extra-legal sources such as televised legal dramas, novels, or articles about juries that they might have come across. Some juries will understand that they do have the power to nullify, while other juries may be misled by judges into thinking that they must apply the law exactly as it is given. Many commentators have suggested that it is unfair to have a defendant's fate depend upon whether he is lucky enough to have a jury that knows it has the power to nullify.

Judges have worried that informing jurors of their power to nullify will lead to jury anarchy, with jurors following their own sympathies. They suggest that informing of the power to nullify will increase the number of hung juries. Some judges also have pointed out that jury nullification has had both positive and negative applications--the negative applications including some notorious cases in which all-white southern juries in the 1950s and 1960s refused to convict white supremacists for killing blacks or civil rights workers despite overwhelming evidence of their guilt. Finally, some judges have argued that informing jurors of their power to nullify places too much weight on their shoulders--that is easier on jurors to simply decide facts, not the complex issues that may be presented in decisions about the morality or appropriateness of laws.

On the other hand, jury nullification provides an important mechanism for feedback. Jurors sometimes use nullification to send messages to prosecutors about misplaced enforcement priorities or what they see as harassing or abusive prosecutions. Jury nullification prevents our criminal justice system from becoming too rigid--it provides some play in the joints for justice, if jurors use their power wisely.

Zenger Trial Homepage

2013-08-20
Inventory
Right to freedom from torture(1)
Right to liberty and security (1)
Right to a fair trial (1)
List of countries signed on to UN human rights (6)
Special representative of the Sect Gen on human rights defenders (2)
The 1503 procedure (9)
Using Intl. Human Rights Mechanisms and Procedures(2)
Writ of Coram Nobis enbanc (40)
Quotes on Jury nullification(6)
Justice Goodloe jury instruction (2)
State's motion in limine (3)
Opinion and Order(27)
Motion and amicus brief (1)
Dist Ct of Gilpin (5)
By Now (2)
Case cites (4) sent a few
USA v. Thomas Odd Man out? (6)
Juror's Handbook (16)
Jury nullification commentaries (7)
Justice often served by jury nullification(3)

You are at the Caught.net Legal Reform Website and the Pro Se Way Website

Caught.Net    Pro Se Way    Handling Bad Judges    "Secret" Canons    Trial Handbook

Bad Judges List    Bad Lawyers List    Legal Abuse Syndrome    Aggrieved Citizens List

# Juror Information Page!

## 1. Jurors' Handbook - A Citizens Guide to Jury Duty

## 2. Jury Nullification - The Secret Constitutional Right

# Jurors' Handbook

### A Citizens Guide to Jury Duty

#### Jump to info on Jury Nullification

Did you know that you qualify for another, much more powerful vote than the one which you cast on election day? This opportunity comes when you are selected for jury duty, a position of honor for over 700 years.

The principle of a Common Law Jury or Trial by the Country was first established on June 15, 1215 at Runnymede, England when King John signed the Magna Carta, or Great Charter of our Liberties. It created the basis for our Constitutional, system of Justice.

### JURY POWER in the system of checks and balances:

In a Constitutional system of justice, such as ours, there is a judicial body with more power than Congress, the President, or even the Supreme Court. Yes, the trial jury protected under our Constitution has more power than all these government officials. This is because it has the final veto power over all "acts of the legislature" that may come to be called "laws".

In fact, the power of jury nullification predates our Constitution. In November of 1734, a printer named John Peter Zenger was arrested for seditious libel against his Majesty's government. At that time, a law of the Colony of New York forbid any publication without prior government approval. Freedom of the press was not enjoyed by the early colonialists! Zenger, however, defied this censorship and published articles strongly critical of New York colonial rule.

When brought to trial in August of 1735, Zenger admitted publishing the offending articles, but argued that the truth of the facts stated justified their publication. The judge instructed the jury that truth is not justification for libel. Rather, truth makes the libel more vicious, for public unrest is more likely to follow true, rather than false claims of bad governance. And since the defendant had admitted to the "fact" of publication, only a question of "law" remained.

Then, as now, the judge said the "issue of law" was for the court to determine, and he instructed the jury to find the defendant guilty. It took only ten minutes for the jury to disregard the judge's instructions on the law and find Zenger NOT GUILTY.

That is the power of the jury at work; the power to decide the issues of law under which the defendant is charged, as well as the facts. In our system of checks and balances, the jury is our final check, the people's last safeguard against unjust law and tyranny.

### A Jury's Rights, Powers, and Duties:

But does the jury's power to veto bad laws exist under our Constitution?

You are at the Caught.net Legal Reform Website and the Pro Se Way Website

Caught.Net    Pro Se Way    Handling Bad Judges    "Secret" Canons    Trial Handbook

Bad Judges List    Bad Lawyers List    Legal Abuse Syndrome    Aggrieved Citizens List

# Juror Information Page!

## 1. Jurors' Handbook - A Citizens Guide to Jury Duty

## 2. Jury Nullification - The Secret Constitutional Right

# Jurors' Handbook

### A Citizens Guide to Jury Duty

### Jump to info on Jury Nullification

Did you know that you qualify for another, much more powerful vote than the one which you cast on election day? This opportunity comes when you are selected for jury duty, a position of honor for over 700 years.

The principle of a Common Law Jury or Trial by the Country was first established on June 15, 1215 at Runnymede, England when King John signed the Magna Carta, or Great Charter of our Liberties. It created the basis for our Constitutional, system of Justice.

### JURY POWER in the system of checks and balances:

In a Constitutional system of justice, such as ours, there is a judicial body with more power than Congress, the President, or even the Supreme Court. Yes, the trial jury protected under our Constitution has more power than all these government officials. This is because it has the final veto power over all "acts of the legislature" that may come to be called "laws".

In fact, the power of jury nullification predates our Constitution. In November of 1734, a printer named John Peter Zenger was arrested for seditious libel against his Majesty's government. At that time, a law of the Colony of New York forbid any publication without prior government approval. Freedom of the press was not enjoyed by the early colonialists! Zenger, however, defied this censorship and published articles strongly critical of New York colonial rule.

When brought to trial in August of 1735, Zenger admitted publishing the offending articles, but argued that the truth of the facts stated justified their publication. The judge instructed the jury that truth is not justification for libel. Rather, truth makes the libel more vicious, for public unrest is more likely to follow true, rather than false claims of bad governance. And since the defendant had admitted to the "fact" of publication, only a question of "law" remained.

Then, as now, the judge said the "issue of law" was for the court to determine, and he instructed the jury to find the defendant guilty. It took only ten minutes for the jury to disregard the judge's instructions on the law and find Zenger NOT GUILTY.

That is the power of the jury at work; the power to decide the issues of law under which the defendant is charged, as well as the facts. In our system of checks and balances, the jury is our final check, the people's last safeguard against unjust law and tyranny.

### A Jury's Rights, Powers, and Duties:

But does the jury's power to veto bad laws exist under our Constitution?

## Jurors Must Know Their Rights:

You must know your rights! Because, once selected for jury duty, nobody will inform you of your power to judge both law and fact. In fact, the judge's instructions to the jury may be to the contrary. Another quote from US vs Dougherty (cited earlier): "The fact that there is widespread existence of the jury's prerogative, and approval of its existence as a necessary counter to case-hardened judges and arbitrary prosecutors, does not establish as an imperative that the jury must be informed by the judge of that power".

Look at that quote again. the court ruled jurors have the right to decide the law, but they don't have to be told about it. It may sound hypocritical, but the Dougherty decision conforms to an 1895 Supreme Court decision that held the same thing. In Sparf vs US (156 US 51), the court ruled that although juries have the right to ignore a judge's instructions on the law, they don't have to be made aware of the right to do so.

Is this Supreme Court ruling as unfair as it appears on the surface? It may be, but the logic behind such a decision is plain enough.

In our Constitutional Republic (note I didn't say democracy) the people have granted certain limited powers to government, preserving and retaining their God-given inalienable rights. So, if it is indeed the juror's right to decide the law, then the citizens should know what their rights are. They need not be told by the courts. After all, the Constitution makes us the masters of the public servants. Should a servant have to tell a master what his rights are? Of course not, it's our responsibility to know what our rights are!

The idea that juries are to judge only the "facts" is absurd and contrary to historical fact and law. Are juries present only as mere pawns to rubber stamp tyrannical acts of the government? We The People wrote the supreme law of the land, the Constitution, to "secure the blessings of liberty to ourselves and our posterity." Who better to decide the fairness of the laws, or whether the laws conform to the Constitution?

## Our Defense - Jury Power:

Sometime in the future, you may be called upon to sit in judgment of a sincere individual being prosecuted (persecuted?) for trying to exercise his or her Rights, or trying to defend the Constitution. If so, remember that in 1804, Samuel Chase, Supreme Court Justice and signer of the Declaration of Independence said: "The jury has the Right to judge both the law and the facts". And also keep in mind that "either we all hang together, or we most assuredly will all hang separately".

You now understand how the average citizen can help keep in check the power of government and bring to a halt the enforcement of tyrannical laws. Unfortunately, very few people know or understand this power which they as Americans possess to nullify oppressive acts of the legislature.

America, the Constitution and your individual rights are under attack! Will you defend them? READ THE CONSTITUTION, KNOW YOUR RIGHTS! Remember, if you don't know what your Rights are, you haven't got any!

[Copyright © 1996 Litigation. Originally published as 22:4 Litigation 6-60 (1996).]

# Jury Nullification:
# The Secret Constitutional Right

by James Joseph Duane

Jump to The Jurors' Handbook

Caught.Net    Pro Se Way    Handling Bad Judges    "Secret" Canons    Trial Handbook

Bad Judges List    Bad Lawyers List    Legal Abuse Syndrome    Aggrieved Citizens List

A bill now pending in the Missouri state legislature has whipped up a firestorm of controversy. Judges and prosecutors there call it "a gut-punch to democracy," "an invitation to anarchy," and a bill that "flies in the face of everything this country stands for." One county prosecutor has even called for the resignation of the 20 state representatives who introduced the bill.

What could have caused such calamity? This supposedly radical legislation would merely require judges to tell criminal juries the undisputed fact that they have "the power to judge the law as well as the evidence, and to vote on the verdict according to conscience." It is hard to remember the last time there was so much turmoil over a proposal to declassify a government secret during peacetime.

Meanwhile, out in Nevada, a 50-year-old florist and grandmother almost landed in prison for her efforts to help spread the word to jurors. When her son went on trial for drug charges in federal court, Yvonne Regas and a friend papered the windshields of nearby parked cars, hoping to let the jurors learn the completely unexpected fact that her son faced 450 years in prison for a single drug transaction nine years earlier. Federal authorities charged her with jury tampering and obstruction of justice, but eventually dropped the charges. Presumably, they gave up hope of figuring out how they could get jurors to convict her without showing them the contents of the pamphlets she had been distributing--and then her jury would know the truth about nullification.

Despite all the modern government resentment toward "jury nullification," its roots run deep in both our history and law. At least two provisions of the Constitution, and arguably three, protect the jury's power to nullify. They also explain why that power is limited to criminal cases, and has no analogy in the civil context.

First, it is reflected in the Sixth Amendment, which grants the accused an inviolable right to a jury determination of his guilt or innocence in all criminal prosecutions for serious offenses. Because of this right, a trial judge absolutely cannot direct a verdict in favor of the State or set aside a jury's verdict of not guilty, "no matter how overwhelming the evidence." Sullivan v. Louisiana, 508 U.S. 275, 277 (1993). Any violation of this rule is automatically reversible error without regard to the evidence of guilt. Id. Indeed, the point is so well settled that it was announced without dissent in Sullivan by a Court that has been unanimous on only a few constitutional questions in the past ten years.

This rule is applied with a rigor that is without parallel in any area of civil practice. For example, it is reversible error to direct a verdict of guilty over the defendant's objection, even if he takes the witness stand and admits under oath that he committed every element of the charged offense! Bryant v. Georgia, 163 Ga. App. 872, 296 S.E.2d 168 (Ga. Ct. App. 1982). (Although one might fairly describe that particular defense strategy as a questionable use of direct examination.)

**Judicial Deference**

Likewise, when a judge takes judicial notice of a fact in a criminal case--for example, that the defendant could not have boarded a train in New York and exited in Texas without somehow crossing state lines--he will tell the jury they "may" accept that fact as proven without further evidence. But he may not tell them that they are required to do so, or take the factual question away from them, no matter how obvious the fact might seem. See Advisory Committee Notes to Fed. R. Evid. 201(g). Even where the defendant and his attorney enter into a formal stipulation admitting an element of the offense, the jury should be told merely that they may regard the matter to be "proved," if they wish, but the judge still cannot direct a verdict on that factual issue or take it away from the jury over the defendant's objection. United States v. Muse, 83 F.3d 672, 679-80 (4th Cir. 1996). All of these rules are designed, in part, to protect the jury's inviolable power to nullify and to avoid the reversible error always committed when "the wrong entity judge[s] the defendant guilty." Rose v. Clark, 478 U.S. 570, 578 (1986).

Second, the roots of nullification also run deep into the (p.7)Double Jeopardy Clause. Even where the jury's verdict of not guilty seems indefensible, that clause prevents the State from pursuing even the limited remedy of a new trial. This rule, by design, gives juries the power to "err upon the side of mercy" by entering "an unassailable but unreasonable verdict of not guilty." Jackson v. Virginia, 443 U.S. 307, 317 n.10 (1979).

Finally, the jury's power to nullify is protected by our abiding "judicial distaste" for special verdicts or interrogatories to the jury in criminal cases. United States v. Oliver North, 910 F.2d 843, 910-11 (D.C. Cir. 1990). Unlike in civil cases, where such devices are routinely employed, in criminal cases it has frequently been held to be error to ask a jury to return anything but a general verdict of guilty or not guilty. United States v. McCracken, 488 F.2d 406, 418-419 (5th Cir. 1974) (collecting cases). This rule is designed to safeguard the jury's power "to arrive at a general verdict without having to support it by reasons or by a report of its deliberations," and to protect its historic power to nullify or temper rules of law based on the jurors' sense of justice as conscience of the community. Id.; United States v. Spock, 416 F.2d 165, 181-82 (1st Cir. 1969). The jury is given "a general veto power, and this power should not be attenuated by requiring the jury to answer in writing a detailed list of questions or explain its reasons." United States v. Wilson, 629 F.2d 439, 443 (6th Cir. 1980). Although the issue is far from settled, a powerful argument can be made that this rule "is of constitutional dimensions," and a direct corollary of the Sixth Amendment's protection of the jury's power to nullify. Wayne LaFave v Jerold Israel, Criminal Procedure § 24.7(a) (2d ed. 1992).

These constitutional rules, in combination, give a criminal jury the inherent discretionary power to "decline to convict," and insure that such "discretionary exercises of leniency are final and unreviewable." McCleskey v. Kemp, 481 U.S. 279, 311 (1987). This state of affairs does not even have a rough parallel in civil cases, where the Seventh Amendment right to a "trial by jury" does not preclude judges from granting summary judgment, directed verdicts, and new trials. (In effect, although both amendments are written quite similarly, the Supreme Court has interpreted the Sixth Amendment to give criminal defendants a right to a jury and a trial; the Seventh Amendment, where it applies, only gives civil litigants the right to a jury if there is a trial.)

The existence of a criminal jury's power to nullify is currently as well settled as any other rule of constitutional law. It is a cornerstone of American criminal procedure. The far more controversial issue--and much more frequently litigated--is that perennial dilemma: What should we tell the kids? Should (or must) the judge tell the jurors anything about their power (or right) to nullify? Should the judge at least allow the defense to tell them? If so, how much should we tell them, and how should we do it? These issues lie at the very core of our criminal justice system, and have been debated by lawyers, journalists, philosophers, and patriots for two centuries. It is therefore ironic that these questions have, at least in recent decades, generated one of the most remarkable displays of unanimity ever orchestrated by state and federal courts on any issue of law in American history.

It would take at most four words to fairly summarize the unanimous consensus of state and federal judges on the idea of telling jurors about their power to nullify: "Forget it. No way." Even while extolling the beauty and majesty of our commitment to the jury's constitutional role as a guardian against tyranny, no state or federal appellate court in decades has held that a trial judge is even permitted--much less required to explicitly instruct the jurors on their undisputed power to return a verdict of not guilty in the interests of justice. The federal courts are unanimous and have been for years, e.g., United States v. Manning, 79 F.3d 212, 219 (1st Cir. 1996) ("a district judge may not instruct the jury as to its power to nullify"). So are the state appellate courts, e.g., Mouton v. Texas, 923 S.W.2d 219 (Tex. Ct. App. 1996); Michigan v. Demers, 195 Mich. App. 205, 489 N.W.2d 173 (Mich. Ct. App. 1992).

### State Law

There is a pervasive myth that three states supposedly allow jury nullification instructions: Georgia, Maryland, and Indiana. See State v. Morgan Stanley Co., 194 W.V. 163, 175, 459 S.E.2d

906, 918 n.27 (W.V. 1995); Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale L.J. 677, 704 n.147 (1995). Some lists also include Oregon. This is presumably because those states have laws or constitutional provisions suggesting that criminal jurors are judges of the law and the facts. But the myth is false. Despite their differing constitutions, all four states have held that a jury has, at most, the power to acquit a guilty man, not the right, and should not be told that it may ignore or nullify the law. See, e.g., Miller v. Georgia, 260 Ga. 191, 196, 391 S.E.2d 642, 647 (Ga. 1990).

Resourceful defendants and their attorneys have tried every conceivable route around this immovable roadblock. All have been thwarted. Without exception, the appellate courts will not allow a defense attorney to use her closing argument to tell the jurors about their power to nullify, or to urge them to use it. See, e.g., United States v. Muse, 83 F.3d 672, 677 (4th Cir. 1996).

Nor can the defense offer evidence that is relevant to nothing (p.8)but the justness of a conviction or acquittal, or is otherwise designed to induce the jury to nullify. United States v. Griggs, 50 F.3d 17, 1995 WL 7669 (9th Cir. 1994). This includes, most notably, any information about the sentence faced by the defendant, even if it is a minimum mandated by law. United States v. Johnson, 62 F.3d 849, 850-51 (6th Cir. 1995).

Judicial disapproval also extends to any evidence or argument designed solely to persuade the jury that the government was guilty of misconduct in its investigation or prosecution. United States v. Rosado, 728 F.2d 89, 93-95 (2d Cir. 1984).

Predictably, the battle is moving to the earliest stages of the trial, but the results are the same. Requests to ask jurors about nullification on voir dire have been denied. United States v. Datche, 830 F. Supp. 411, 418 (M.D. Tenn. 1993).

One pro se defendant tried to persuade the Supreme Court that her trial judge improperly refused to let her challenge for cause those prospective jurors who did know or understand the term "jury nullification." Mendonca v. Oregon, 55 U.S.L.W. 3362 (1986) (petition for certiorari). The Court decided it might tackle that one later, and denied review. 479 U.S. 979 (1986).

Defendants will go to any lengths to get this forbidden topic of discussion before the jury. In one recent case involving minor charges in traffic court, a pro se defendant offered the State of Pennsylvania a bargain of almost Faustian proportions. He asserted a right to execute a release of his property rights under state law and all of his privileges and immunities secured by the Fourteenth Amendment, subject to the condition that he would revert to the status of an "American Freeman" with all of the "common law rights thereof, including the right to a jury possessing the power of jury nullification." Phelps v. Pennsylvania, 59 U.S.L.W. 3522 (1991) (petition for certiorari). The Supreme Court passed up this chance to decide the issue, perhaps preferring to wait until it percolates a bit more in the lower courts. 498 U.S. 1088 (1991).

Judicial hostility to jury nullification goes well beyond the stone wall of silence erected around the jury box. Case after case has approved jury instructions actually designed to imply that jurors do not have such power at all, or to "instruct the jury on the dimensions of their duty to the exclusion of jury nullification." United States v. Sepulveda, 15 F.3d 1161, 1190 (1st Cir. 1993). For example, criminal jurors are routinely ordered: "You must follow my instructions on the law, even if you thought the law was different or should be different," Eighth Circuit Pattern Criminal Jury Instruction 3.02 (1991), and "even if you disagree or don't understand the reasons for some of the rules." Federal Judicial Center, Pattern Criminal Jury Instruction 9 (1987).

In extreme cases, this judicial hostility even extends to dishonesty. As Chief Judge Bazelon correctly observed, current law on this topic is tantamount to a "deliberate lack of candor." United States v. Dougherty, 473 F.2d 1113, 1139 (D.C. Cir. 1972) (dissenting opinion). In one especially outrageous case, the jury deliberated for hours in a criminal tax case before sending the judge a note asking: "What is jury nullification?" The defendant was convicted shortly after the judge falsely told the jury that "there is no such thing as valid jury nullification," and that they would violate their oath and the law if they did such a thing. United States v. Krzyske, 836 F.2d

Case 3:13-cr-00058-CCC-MEL    Document 108-3    Filed 09/11/13    Page 10 of 19

1013,1021 (6th Cir. 1988). Over a vigorous dissent, the Court of Appeals deemed the instruction proper and affirmed the conviction, id., even after the defendant furnished the court with an affidavit from a juror who swore he would have acquitted if "we were told the truth about jury nullification." United States v. Krzyske, 857 F.2d 1089,1095 (6th Cir. 1988).

This widespread judicial pattern is highly ironic. The courts have unanimously (and erroneously) refused to let defense attorneys argue for nullification, typically by insisting that the jury has no power to consider what the law should be, and that juries have no lawful task but to decide whether the defendant broke the law. Yet, in a fit of sheer inconsistency, the same federal courts of appeals are also unanimous that it is permissible for prosecutors to urge juries to act as the "conscience of the community" and use their verdict to "send a message" about whether society should be willing to tolerate the defendant's alleged conduct. James J. Duane, "What Message Are We Sending to Criminal Jurors When We Ask Them to 'Send a Message' With Their Verdict?," 22 Am. J. Crim. Law 565, 576-79 (1995).

The Sixth Amendment creates a right for the defendant to insist on a jury to act as a community conscience and protect him from government oppression, and yet only the State is allowed, when it chooses, to ask the jury to consider matters of morality and conscience. Id. at 590-602. Thus have we witnessed a complete perversion of the constitutional priorities and structure.

One might fairly summarize the case law this way: "You may hope that the jury will refuse to apply a harsh, unfair, or inequitable law, but you may not urge them to do so." Steven Lubet, Modern Trial Advocacy 436 (1993) (emphasis added). But why not? Why can't we tell the jury a little bit more than we do about the truth? Not since the storming of the Bastille have the forces of government been so tightly united in their opposition to a popular uprising. Numerous arguments have been advanced by judges around the country for this refusal, but not one stands up to serious analysis.

1. "Jury nullification is an embarrassing glitch in our law." What should we tell jurors about their power to nullify? The answer depends largely on one's attitude toward a closely related issue: Just what is nullification anyway, and why is it protected by the Constitution? One of the most frequent justifications for refusing to tell juries about their power to nullify is the pernicious suggestion that this power is the product of some accidental or regrettable flaw in our system of justice.

Jury nullification has been described in many ways, some of which cannot be repeated in respectable society. At one extreme, a federal judge recently hailed it as "one of the peaceful barricades of freedom." Jack B. Weinstein, "Considering Jury 'Nullification': When May and Should a Jury (p.9)Reject the Law to Do Justice," 30 Am. Crim. L. Rev. 239, 254 (1993). Even courts declining to instruct juries about the doctrine have conceded that "the pages of history shine on instances of the jury's exercise of its prerogative to disregard uncontradicted evidence and instructions of the judge." United States v. Dougherty, 473 F.2d 1113, 1130 (D.C. Cir. 1972). Notable examples include the courageous refusal of northern jurors to convict "guilty" men who violated the fugitive slave laws. Id.

On the other hand, some courts have suggested that the power to nullify is merely "a tolerated anomaly in the rule of law.'" Mayfield v. United States, 659 A.2d 1249, 1254 (D.C. 1995). They call it a void in the law, giving jurors "the power to do what they want in a given case because neither the prosecution nor the court has the authority to compel them to do what they should." State v. Bjerkaas, 472 N.W.2d 615, 619 (Wis. App. 1991). (emphasis added). Others assert that the power exists only because "there is nothing to prevent" it, but that it "is not a legally sanctioned function of the jury and should not be encouraged by the court." State v. Weinberg, 631 N.E.2d 97, 100 (N.Y. 1994). The sensational-sounding charges have been made that a nullification instruction would "encourage the jury to abdicate its primary function," id., or that it would "in essence direct juries that they could run amuck" Davis v. State, 520 So. 2d 493, 494-95 (Miss. 1988). Scores of other cases have tried to capture this same point by insisting that juries always have the power to nullify, but never the right to do so.

Case 3:13-cr-00058-CCC-MEL   Document 108-3   Filed 09/11/13   Page 11 of 19

So who is correct? Is the institution of nullification deliberately enshrined and protected in the Constitution as a valuable political end in itself, as some have suggested? Or is it merely a regrettable byproduct of careless drafting, or an anomalous but necessary evil we "tolerate" because of our commitment to some greater good? And how could the courts be so very far apart in their responses? The answer to this confusion depends on how one defines "jury nullification," a term with various shades of meaning.

In its broadest form, "nullification" has often been used to describe the jury's "raw power to set an accused free for any reason or for no reason," Sepulveda, 15 F.3d at 1190, even for reasons having nothing to do with justice or guilt.

### The Jury's Rights

An acquittal may come because the jurors found the defendant attractive, or were members of the same race, or harbored hatred toward the victim's race, or merely because they were tired of being sequestered for months. This possibility, which might fairly be called "lawless nullification," is protected by our Constitution not for its own sake, but because of our commitment to the secrecy of jury deliberations and the finality and unreviewability of their verdicts. (This is true in much the same way that the First Amendment protects the right to say many things that nobody would publicly hold up as a model of good civic behavior.)

There is no compelling reason why a jury should learn every dirty little secret of our system of justice, especially if that knowledge would undermine the purpose of the proceeding or the jurors' perception of the seriousness of their role. See Caldwell v. Mississippi, 472 U.S. 320, 323 (1985) (error to give jury misleading view of the extent of appellate review of their sentencing recommendation). Thus, the courts are correct to hold that the law should not require or encourage a judge to remind jurors of the regrettable fact that they have the raw power to acquit for any arbitrary or spiteful reason, or indeed for no reason at all. But in no reported case, to my knowledge, has any defendant or his attorney requested an instruction that would go even half that far.

In the real world, outside the pages of appellate judicial opinions, defendants almost invariably make the far more modest request that the jury be told merely of its authority to acquit an accused if a conviction would conflict with their deeply seated sense of morality and justice. In this, its purest form, the possibility of "nullification" is not some accidental byproduct of careless drafting in the Constitution, nor of our commitment to some greater good. It is one of the very reasons for the existence of the Sixth Amendment's inflexible insistence that the accused has the right to a jury of his peers.

The jury is there, by design, "to prevent oppression by the Government" and to "protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority." Duncan v. Louisiana, 391 U.S. 145, 155-56 (1968). The jury's role "as a check on official power" is in fact "its intended function." Batson v. Kentucky, 476 U.S. 79, 86-87 n.8 (1986). The jury injects "a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions." United States ex rel. McCann v. Adams, 126 F.2d 774, 775-76 (2d Cir. 1942) (Learned Hand, J.). That is why a directed verdict for the state would be not merely unconstitutional--it "would be totally alien to our notions of criminal justice," since "the discretionary act of jury nullification would not be permitted." Gregg v. Georgia, 428 U.S. 153, 199 n.50 (1976) (plurality opinion).

This is also the defect in the long line of cases that disparage (p.10)nullification by claiming that the jury has only the "power," but not the "right," to do it. That may be a fair description of the jury's latitude to acquit for any lawless reason that pleases them--its "power to bring in a verdict in the teeth of both law and facts." Horning v. District of Columbia, 254 U.S. 135, 138 (1920). But the jury's power to acquit out of justice or mercy is a constitutionally protected right. If not their right, it is at least the defendant's firmly settled right that he insist on a jury with such power, regardless of whether the proof of his technical legal guilt is literally overwhelming and uncontradicted. Sullivan v. Louisiana, 508 U.S. 275, 277-82 (1993). Any judicial instructions that would prevent the exercise of this right are unconstitutional.

These considerations about the historical roots of the right to a jury trial, by themselves, do not dispose of the question whether the jury should be instructed about nullification. But they easily suffice to dispatch the absurd suggestion that the latitude allowed for an acquittal based on the jury's sense of justice should be kept from the jury because it is only a flaw in the system's design, or that it is not a legally sanctioned function of the jury.

2. "Nullification instructions encourage the jury to violate the law." Some courts have reasoned that a nullification instruction would permit, if not encourage, the jurors to disregard or break the law. One court even held that it is proper to affirmatively instruct the jurors that they would "violate the law" if they engaged in nullification or if they violated any of the judge's instructions on the law. United States v. Krzyske, 836 F.2d 1013, 1021 (6th Cir. 1988). Another has reasoned that "anarchy would result from instructing the jury that it may ignore the requirements of the law." Powell, 955 F.2d at 1213. Such assertions are baseless.

Contrary to the widespread myth popular among judges, there is no "law" that requires juries to convict every man shown to be technically guilty beyond a reasonable doubt. "The power of the courts to punish jurors for corrupt and incorrect verdicts," Dougherty, 473 F.2d at 1130, that darling of the Star Chamber's nursery, was banished from the pages of Anglo-American law centuries ago. Today, at its very core, our system of justice is unflinchingly committed to the liberty of criminal juries to "err upon the side of mercy," Jackson, 443 U.S. at 317, or to "refuse to convict even though the evidence supported the charge." Gregg, 428 US. at 199 n.50. Any system that restricted such liberty "would be totally alien to our notions of criminal justice." Id. In this respect, nullification is every bit as lawful as leniency extended by the prosecutor, or the judge, or the governor. Id.

Nor does any "law" forbid a jury from pardoning a man who violated an unjust statute, even if an acquittal requires them to ignore the court's instructions on the law. The Constitution does no such thing; it actually protects the jury's right to acquit based on their sense of justice. The penal code does not criminalize such conduct, and would be clearly unconstitutional if it did. Not even the Bible imposes any such rule. See Deuteronomy 16:20 ("Follow justice and justice alone"). If there is any such "law," it is true only in the narrow sense of illegitimate case law made up by judges acting well beyond the scope of their lawful authority.

Judges who tell each other that "nullification is illegal" are more than vaguely reminiscent of the judge who once told a criminal defendant: "Rule Forty-Two. All persons more than a mile high to leave the court! It's the oldest rule in the book." Lewis Carroll, Alice's Adventures in Wonderland 256 (Bramhall House 1960). As the defendant adroitly responded: "Then it ought to be Number One"--or it ought to be, at the very least, written down in the Constitution, or the penal code, or somewhere besides judicial opinions.

3. "The Supreme Court said not to tell the jury about it." A surprising number of courts have tried to blame the Supreme Court for their refusal to tell juries about the power to acquit on moral grounds. That myth is also false. The Supreme Court has never said such a thing.

In the two cases widely cited for this proposition, the Court merely declared that a jury is not entitled to decide what the law is or should be, and that "a judge always has the right and duty to tell them what the law is upon this or that state of facts that may be found." Horning v. District of Columbia, 254 U.S. 135, 138 (1920) (Holmes, J.); accord Sparf and Hansen v. United States, 156 U.S. 51 (1895). This language has been widely cited by lower courts as authority for their refusal to permit any argument or instructions on nullification. E.g., Krzyske. 836 F.2d at 1021.

In fact, however, Horning and Sparf have nothing to do with this matter. It would indeed be improper to tell a jury that "they are to determine the rules of law." Dougherty, 473 F.2d at 1136. In Sparf, for example, the Supreme Court properly refused a murder defendant's request that his jury be told they could convict him of manslaughter out of leniency, even though he conceded that there was no evidence to support a finding of guilt on such a lesser charge! 156 U.S. at 99. If that were the law, of course, we ought to read the jury the entire penal code, just in case

manslaughter seems too harsh, so they could perhaps convict him of driving with a bad muffler instead, or maybe acquit him on the grounds of intoxication.(p.11)

Our entire system of justice would be undermined if jurors had the liberty to return a false verdict--even for benign motives of mercy--convicting a defendant of a lesser offense she simply could not have committed, or acquitting her because of some legal defense with absolutely no basis in the evidence.

But that straw man has nothing to do with the typical case of a defendant seeking an instruction on nullification. Such instructions need not suggest that jurors be told they can decide for themselves what the law is or should be, or that they can convict the defendant of some lesser offense (or acquit on the basis of some affirmative defense) with no basis in the facts. Our law does not countenance such contrivances and should not encourage them. But a proper nullification instruction or argument would merely tell the jury the fact-- or at least confirm their intuitive suspicion that our law intentionally allows them the latitude to "refuse to enforce the law's harshness when justice so requires." LaFave and Israel, Criminal Procedure § 22.1, at 960. Whether that information should be given to the jury has never been considered or decided by the Supreme Court. Id. But it is the height of hypocrisy to refuse to report that truthful information about our constitutional law to the jury on the pretense that the judge "has the right and duty to tell them what the law is." Horning, 254 U.S. at 138 (emphasis added). That language, taken literally, would require the judge to tell the jury much more than we do about nullification.

There is one variant of nullification, however, that appears to have been recently foreclosed by the Supreme Court. Without specifically addressing the topic of nullification, the Court recently held that jurors should not be given distracting information about the sentencing consequences of their verdict, even when that evidence might serve to correct inconsistent and erroneous beliefs the jury is likely to harbor about the effect of their verdict. Shannon v. United States, 114 S. Ct. 2419, 2427 (1994). That reasoning would also appear to apply where the defendant seeks to tell the jury about sentencing information solely to persuade them to acquit out of compassion and mercy, as the lower courts have already acknowledged. See United States v. Johnson, 62 F.3d at 850. Limiting the Jury's Discretion

The reasoning of Shannon, consistently applied, would take a big bite out of the jury's power to nullify. An oppressive political regime could achieve some surprising results by persuading a jury to convict an accused of some seemingly minor offense that carries a surprisingly draconian penalty. Without accurate sentencing information, jurors would be unable to nullify such a monstrous law--or worse yet, might even end up playing right into the government's hands by guessing incorrectly.

Heidi Fleiss, for example, was convicted of consensual sex offenses by jurors who were "outraged" to later learn she faced a minimum three-year prison sentence. Despite several jurors' belief that she was innocent, the jurors had struck a deal after four days of deliberating and acquitted her of drug charges--where the evidence was stronger--because they were "under the mistaken impression that the narcotics charge carried a stiffer penalty." Shawn Hubler, "Court Overturns Fleiss' Conviction, Orders New Trial," L.A. Times, at A1 (May 30, 1996). (Of course, trials like this one--and many others--undermine the Supreme Court's crucial assumption that jurors can be trusted to heed our standard instruction to disregard possible punishment when reaching their verdict.)

Shannon did not close the door to most forms of nullification, however. As the Court properly reasoned, it would be difficult to decide where to draw the line once we open the jury room door to even truthful information about the long-run sentencing consequences of their verdicts. Shannon, 114 S. Ct. at 2427-28 n.11. But that logic does not apply to the normal case of nullification, where the accused desires an acquittal based only on the moral implications of the evidence already properly before the jury concerning the details of his conduct, and does not seek to smuggle into the record any facts they did not already learn from the prosecutor.

4. "We can't encourage the jurors to violate their oath." Perhaps the most threadbare judicial

Case 3:13-cr-00058-CCC-MEL   Document 108-3   Filed 09/11/13   Page 14 of 19

objection to nullification arguments is that "neither the court nor counsel should encourage jurors to violate their oath." United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983). These cases routinely assume that a jury's oath forbids them from nullifying for any reason, even if based on their firm belief that a conviction would be a terrible miscarriage of justice. One prosecutor recently reiterated the age-old complaint that "jury nullification gives status and dignity to what is basically violating your oath as a juror to follow the law." Tony Perry, "The Simpson Verdicts," LA. Times, at 5 (Oct. 5, 1995).

Moreover, it has been recommended that federal judges go one step further and routinely tell jurors, "You are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them." Sixth Circuit Pattern Jury Instruction 1.02. If the jurors explicitly ask about nullification, we are told that the judge should warn them of the supposed "fact" that acquittal of a guilty man for any reason would be a breach of their solemn oaths as jurors. Krzyske, 836 F.2d at 1021.

This ominous-sounding charge has no logical substance, although it naturally carries much emotional appeal. Jurors know that oaths are serious business, see Exodus 20:7, 16, and the law never permits or encourages anyone to do anything contrary to his oath. But despite its tremendous popularity among judges, this argument is by far the most misshapen stone in the barricade judges have been erecting around the jury box.

To begin with, it is usually false. The typical oath taken by jurors today does not forbid them from refusing to convict based on their sense of justice. In fact, many oaths administered today are barely even intelligible. At the beginning of (p.12)the trial, jurors are typically asked to swear that they "will well and truly try and a true deliverance make between the United States and the defendant at the bar, and a true verdict render according to the evidence, so help [me] God." United States v. Green, 556 F.2d 71 n.1 (D.C. Cir. 1977).

Nobody still alive today knows for sure what it means to "make a true deliverance." But nothing in this oath would forbid jurors from acquitting if they are convinced--based solely on "the evidence"--that the accused's actions were morally blameless and that a conviction would be unjust. In such rare cases, no jurors could be said to have decided a case "well and truly" if they had to disregard their sense of justice to convict. And an acquittal in that case would certainly sound like a "true deliverance." See Proverbs 24:11 ("Rescue those being led away to death"); Isaiah 61:1 ("He has sent me to proclaim freedom for the captives and release from darkness for the prisoners").

If a jury refuses to convict a man because of overwhelming feelings of mercy or justice, they are not returning a "false" verdict. A verdict of "not guilty" based on a jury's notions of justice is not affirmatively declaring that he is innocent. (The same is true of an acquittal based on their conclusion that he has only been shown to be probably guilty, but not beyond a reasonable doubt.) The general "not guilty" verdict is merely a shorthand way of allowing the jury to express, for reasons they need not explain, "we do not choose to condemn the accused by pronouncing him guilty."

The standard objection to nullification instructions might carry at least superficial plausibility in those jurisdictions where the jury is sworn to render "a true verdict according to the evidence and the charge of the Court." United States v. Pinero, 948 F.2d 698, 699 n.3 (11th Cir. 1991). If those same jurors are later instructed by the court that they "must convict" where there is proof of legal guilt beyond a reasonable doubt, it probably would be a violation of such an oath to disregard the court's charge and acquit the man because his conduct was morally blameless.

But this objection to nullification instructions utterly begs the question. It is clear that defendants can make at least a plausible claim to a moral (and perhaps constitutional) right to appeal to the jurors to acquit out of justice or mercy. That argument must either stand or fall on its own merit, without any regard to the present wording of the jurors' oath.

### Constitutional Protection

[handwritten margin note: "If the Glove Doesn't fit you Must Aquitt!"]

It is a colossal red herring to dismiss such claims with the rejoinder that nullification acquittals would "violate the jurors' oath." No judge can brush aside a plausible constitutional argument by saying "You might be right, but we do not decide the question, because we have already extracted a solemn vow from the jurors to abide by a different procedure that arguably violates your moral and constitutional rights." That "logic" could lead to some remarkable results in jurisdictions determined to defeat other constitutional provisions as well.

A jury's latitude to nullify is deliberately protected by the Constitution. Neither the tradition nor the wording of the oath administered to the jurors, on the other hand, is so dictated. In federal court it is not even prescribed by statute. It is simply an old tradition judges have made up. If the wording of the oath poses some conflict with the jury's constitutional prerogative to nullify, it is clear which one must yield the right of way. Courts simply have no business (much less lawful authority) asking jurors to swear to anything that would violate the Constitution or the jury's deeply held convictions about justice.

Besides, while we are on the subject of oaths, it is well to remember that there is always one party in the courtroom who is required to take an oath prescribed by federal law--and it is not the jury. Before ascending to the bench to try his first case, every federal judge is required by law to swear or affirm to uphold the Constitution (which includes the Sixth Amendment), and "that I will administer justice without respect to persons." 28 U.S.C. § 453. That is a most peculiar-sounding oath for anyone who intends to browbeat jurors into putting aside any notions of "justice" that might stand in the way of their willingness to condemn a morally blameless man.

Beyond all this, perhaps the most blasphemous aspect of the invocation of the oath is the simple fact that we really do not expect jurors to refrain from nullifying in all circumstances. That being the case, it ill-behooves us to place jurors under an oath that they will not nullify (much less lie to them about whether they have taken such an oath).

At least for those jurors who take their oaths seriously, it places them in an intolerable and totally unnecessary conflict between deeply held moral scruples. It demeans the seriousness of the oath, which stands at the very bedrock of our system of justice. United States v. Dunnigan, 507 U.S. 87, 97 (1993).

And when citizens and jurors gradually get wind of the fact that we really don't expect them to always refrain from nullifying, despite their alleged oaths to the contrary, who can blame any of those people from cutting corners with their future oaths as witnesses or elected officials?

5. "We give them enough hints already." Perhaps the most baffling excuse for refusing to tell jurors about nullification is the excuse that we already give them a few ambiguous (p.13)clues about their power to nullify. In the seminal Dougherty case, for example, which remains the most influential opinion ever written on this topic, the Court of Appeals reasoned that explicit instructions would be superfluous, in part because juries get the message in a variety of subtle ways. The court based this holding, in part, on its axiomatic assumption of "the fact that the judge tells the jury it must acquit (in case of reasonable doubt) but never tells the jury in so many words that it must convict." 473 F.2d at 1135 (emphasis added)

The first problem with this justification is that it proceeds on a premise that is no longer generally true. Contrary to the Dougherty court's assumption about what a criminal trial judge would "never" do, the United States Judicial Conference has instructed federal judges to tell every criminal jury that "if you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty." Federal Judicial Center, Pattern Jury Instructions 21 (1987). Several courts have formally approved similar instructions telling the jury they "must" convict. See People v. Bernhard Goetz, 73 N.Y. 2d 751, 752, 532 N.E.2d 1273 (N.Y. 1988). Indeed, one Circuit Court of Appeals recently went so far as to state (in an unpublished decision) that instructing jurors any other way--for example, that they "should" convict--is at least "arguably" forbidden by the supposed "rule" that a jury is not to be told that nullification is a permissible course to take. United States v. Fuentes, 57 F.3d 1061, 1995 WL 352808 at **2 (1st Cir. 1995).

The reasoning of these cases is indefensible. Telling a jury they "must" convict where guilt has been proven beyond a reasonable doubt is a serious misstatement of the law and "an error of the most egregious nature." Proceedings of the 53rd Jud. Conf. of the D.C Circuit, 145 F.R.D. 149, 175 (1992) (Remarks of R. Kenneth Mundy, Esq.). Under our Constitution, by design, a defendant is entitled to have his fate decided by a jury even if the evidence of his guilt is undisputed and decisive. Sullivan, 508 U.S. at 277. This is because criminal jurors are entitled to "refuse to convict even though the evidence supported the charge," and any legal system which would strip jurors of that discretion would be "totally alien to our notions of criminal justice." Gregg v. Georgia, 428 U.S. 153, 199 n.50 (1976).

Besides, even if we gave jurors the instruction that they "should" convict, it would hardly suffice to convey to the jury the solemnity of their awesome responsibility to acquit on the grounds of justice in exceptional cases. The Dougherty court candidly conceded that the pregnant implications of that ambiguity "would on their face seem too weak to notice." 473 F.2d at 1135. And even if some jurors could be fairly trusted to pick up on the subtle ambiguity left open in the contrast between instructions as to when they "should convict" and "must acquit," others will not. Far too much is at stake here to trust such nuances to a haphazard system of instructing jurors with hints. It violates both the Due Process and Equal Protection Clauses to let the outcome of criminal cases turn on "coded instructions" that we hope and pray a few jurors will be clever enough to notice and decipher on their own, all for the benefit of a select and arbitrarily chosen group of lucky defendants. Such a system of "justice" is no better than a judge who thinks too many jurors are relying on the insanity defense, so he sticks that portion of his instructions in one of eight empty drawers under the table in the jury room.

We see a similar fallacy in another bizarre compromise struck by several lower courts. Caught between the conflicting commands of the Sixth Amendment ("juries exist to protect the accused from the Government") and the appellate courts ("tell the jury they must ignore the demands of justice"), several trial judges have adopted the pathetic compromise of allowing the defense attorney to talk about nullification in closing arguments, but have refused to endorse such arguments in their instructions, even after the jurors predictably ask for further guidance from the judge. E.g., Krzyske, 836 F.2d at 1021. This, too, is no solution.

The Supreme Court has repeatedly declared that "arguments of counsel cannot substitute for instructions by the court." Carter v. Kentucky, 450 U.S. 288, 304 (1981). "The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." Boyde v. California, 494 U.S. 370, 384 (1990).

No matter how infrequently we hope to see juries exercise their constitutionally protected power to nullify the operation of unjust laws, there is simply far too much at stake to entrust that important possibility to the implications of "cryptographic instructions," or to closing arguments that seem to conflict with the charge of the court. In the final analysis, the best answer to all this nonsense was written long ago by Judge Cardozo. He observed in a related context that he had no objection to giving a jury greater latitude with their verdicts in a case that "seems to call irresistibly for the exercise of mercy, but it should be given to them directly and not in a mystifying cloud of words." "What Medicine Can Do for Law," in Law and Literature 70, 100 (1931) (quoted in McGautha v. California, 402 U.S. 183, 199 (1971)).

6. "If the case is important enough, they will figure out we're not too serious about all this anyhow." There have been many silly excuses for refusing to tell juries the truth about their lawful authority to nullify. But the most frightening of all teaches that jurors are most likely to nullify only on rare and special cases just as we secretly hope they will--if we falsely suggest to them that they have no such power or moral authority.

The reasoning here is that the lawful power to nullify is least likely to be abused, and most likely to be reserved for the rare cases when it is truly appropriate, if we structure our rules to make nullification "an act in contravention of the established instructions." Dougherty, 473 F.2d at 1136-37. After all, the argument goes, jurors always draw their understanding about the operation

Case 3:13-cr-00058-CCC-MEL   Document 108-3   Filed 09/11/13   Page 17 of 19

of the system from a variety of (p.14)sources in the popular culture, even apart from the judge's instructions. Id. at 1135. This will, in theory, allow nullification to rear its ugly head only when the inequities of the case are sufficiently compelling to persuade the jurors to cook up the idea and violate the judge's instructions on their own initiative. Id. at 1136.

This "reasoning" was never persuasive even when it was first handed down to the lower courts more than 20 years ago, as Chief Judge Bazelon noted in his dissenting opinion in Dougherty. But it is indefensible today. Even if one could possibly hope that "nullification" might be a secret to most jurors two decades ago, those days are now gone. Everyone who followed the key events in O.J. Simpson's criminal trial--which means everyone--understands by now at least this much: jurors in a criminal trial can listen to ten months of evidence that the government has publicly proclaimed to be overwhelming and conclusive, and still acquit after three hours of deliberating without being stopped on their way to the parking lot. That is, in the main, a pretty fair description of the rough contours of the jury's power to nullify.

At about the same time, a law professor has quickly risen to fame with his remarkable plea that black political and spiritual leaders join his quest to inform their constituencies of their undisputed power to acquit black defendants solely because of their race. Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale L.J. 677, 723-25 (1995). That dirty little secret about our criminal justice system was subsequently featured in countless newspapers, articles, and television shows. Professor Butler has appeared to discuss this fact on 60 Minutes and Geraldo Rivera. If there was anyone who hadn't heard before this summer, the lid was blown off the story once and for all when it ran in the June 1996 issue of Reader's Digest.

Joining in the fray with gusto, of course, is the Fully Informed Jury Association (FIJA), a tax-exempt educational group with thousands of members devoted to informing future jurors about their power to nullify. They even have an impressive and thoughtful site on the Internet with hundreds of visitors each day. (Although I am naturally loath to admit having visited it in a journal the FBI may be reading.) Members have passed out pamphlets about nullification by the thousands outside of key trials. Legislation to require judges to issue such instructions has been introduced in dozens of state legislatures, as yet unsuccessfully, generating even more public attention to the topic. The group complains--with some justification--that they desire only to see to it that judges, like everyone else in the courtroom, are required to tell the truth and the whole truth.

With all this amateur mass legal education going on in earnest, "barber shops and beauty parlors everywhere are all abuzz with talk of 'jury nullification,' whether they call it by its proper name or not." Clarence Page, "Jury Nullification Can Create Justice," Dayton Daily News, A10 (Nov. 27, 1995). Our judicial system needs to take stock of this reality, and fast. The integrity and credibility of the system will be stretched to the breaking point as more and more jurors bring to their secret deliberations "inside knowledge" about the way the system really works, and about the reasons for the judge's refusal to share or confirm those details.

To make matters worse, imagine what will happen when even a few people bring into the jury room the secret knowledge that our system conceals the facts about nullification in the explicit (but unshared) hope that the jurors will see through our standard instructions and ignore them when that is called for! At that point, we will have no reliable protection against the danger that some jurors will reason, perhaps privately, that maybe some of our other hard and fast "rules of law" are also there for public relations purposes, designed to be ignored in special cases by jurors sophisticated enough to know how the system really works--or can be worked. The integrity of our court system will then be shattered beyond repair.

But for the fragile good faith of jurors, for example, we have no logical or moral basis for our otherwise rash assumption that a juror can be trusted to acquit, rather than convict, a defendant who has not quite been proven guilty beyond a reasonable doubt, "even if he is convinced the defendant is highly dangerous and should be incarcerated." Shannon, 114 S. Ct. at 2427. When jurors get wind of the appearance that at least some of our most fundamental rules are really just window dressing, what protection will we have against "nullification convictions" by jurors who refuse to release dangerous or despicable villains entitled to acquittals on the basis of seemingly

Case 3:13-cr-00058-CCC-MEL   Document 108-3   Filed 09/11/13   Page 18 of 19

unjust legal technicalities?

More and more legal essays are starting to surface with the rather casual assertion that "nullification convictions" can never be a real danger, in part because the judge and the Court of Appeals supposedly have the power to overturn a guilty verdict that is not supported by the evidence. E.g., Gail Cox, "Feeling the Pressure: Jurors Rise Up Over Principle and Their Perks," Nat'l law J., A1 (May 29, 1995). Those assurances, if repeated often enough, will make the problem even worse.

This supposed "fact" about our system of justice is the most nefarious of all, and will do irreparable damage if it falls into the wrong hands in the jury room. It is hard to imagine a clearer illustration of the maxim that a little knowledge can be a dangerous thing. Any jurors will be far more inclined to convict in close cases if they have picked up the mistaken impression that a judge is both empowered and likely to correct any mistakes in their assessment of the evidence. (That is especially true if one of the jurors advises the others that a mistaken verdict of acquittal, on the other hand, is final and unreviewable, which is now fairly common knowledge after the Simpson trial.) That would only enhance the already great temptation for them to abdicate their solemn responsibility by passing the buck to the judge.

In fact, a judge's power to enter a judgment of acquittal despite a contrary jury verdict is merely a token safeguard against the unjust conviction of the innocent (and anyone (p.59)else not proven guilty beyond a reasonable doubt). It serves to overturn unjust convictions only after the extremely rare trial where there is no evidence that could satisfy any rational jury beyond a reasonable doubt. In all other cases, one seeking to overturn a guilty verdict based on the sufficiency or quality of the evidence against him "follows in the footsteps of countless criminal defendants who have made (p.60)similar arguments," and "faces a nearly insurmountable hurdle." United States v. Hickok, 77 F.3d 992, 1002 (7th Cir. 1996). The judge cannot reweigh the evidence, and challenges to a witness's lack of credibility are "wasted on an appellate court." United States v. Pulido, 69 F.3d 192, 206 (7th Cir. 1995). Once the jury chooses to convict, regardless of the reason, its verdict will stand as long as it is based on any evidence in the record they might have chosen to believe, even testimony that "is totally uncorroborated and comes from an admitted liar, convicted felon, large-scale, drug-dealing, paid government informant." Pulido, 69 F.3d at 206. Heaven help us all if the jurors of the nation get word of these exaggerated suggestions that federal judges stand guard against "nullification convictions"!

## Inadequate Solution

Besides, even if we radically restructured federal law to give a judge plenary authority to reverse a conviction she thought was not proven beyond a reasonable doubt, it still would not solve the problem. Even that arrangement would not be adequate to protect the constitutional rights of the accused. "It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine whether he is guilty beyond a reasonable doubt." Sullivan, 508 U.S. at 278.

Meanwhile, as more Americans get the justifiable impression that the courts are not being perfectly candid with jurors, they are naturally and gradually losing their normal inhibitions about lying to judges. Prior to sensational trials, jurors' rights activists now give everyone entering the courthouse pamphlets advising of them of their power to nullify, warning them that the judge will deny it, and pleading with them to deny any "knowledge of this material" during jury selection. Joe Lambe, "Bill Would Let Juries Decide Law in Cases; Legal Establishment Reacts to Measure with Shock, Dread," Kansas City Star, at A1 (April 8, 1996). An outspoken law professor has publicly declared his willingness to lie under oath during jury selection, if necessary, to conceal his true attitudes toward nullification and get the chance to nullify death penalty cases. Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale L.J. 677, 724-25 n.236 (1995). That same law teacher has also invited Americans by the thousands to decide for themselves whether perjury during jury selection might be "morally justifiable" for some greater good such as racial justice. Id.

If our criminal justice system is to retain some semblance of integrity in the long run, it is vital that we treat jurors with greater candor about the moral and legal contours of their power to nullify. Fortunately, it wouldn't take long. A clear and adequate instruction could be conveyed in a single sentence, explaining that the jury should (not "must") convict anyone proven guilty beyond a reasonable doubt, unless the jurors have a firm belief that a conviction would be fundamentally unjust. Such an instruction would give defendants all the protection they deserve against wrongful prosecution. It would preserve the jury's constitutionally protected veto power over unjust prosecutions. It would minimize the terrible danger of jurors persuading each other that the judge is withholding (or concealing) crucial facts about the way the system is designed to work. And it would, at long last, permit us in good conscience and good faith to ask jurors to take a solemn oath to abide by the court's charge.

Proper instructions on nullification are now quite like sex education to youth in many different ways. There may well have been a time, several decades ago, when it was feasible to avoid both subjects altogether, hoping that our young wards would never even hear much about them until a truly pressing need might arise for them to divine a few things on their own initiative. But now there are precious few secrets about either subject that cannot be found on the Internet and in every major magazine--along with many dangerous falsehoods and half-truths. If we persist in our refusal to confront these delicate topics head-on, jurors and children will continue making terrible choices as they learn for themselves what a dangerous thing a little knowledge can be. And in the process, judges and parents alike will continue to lose much of their credibility in the eyes of those who correctly perceive their right to honest guidance from us.

Mr. Duane is an associate professor at Regent Law School in Virginia Beach, Virginia



Now using Google Search!

Google Search
☑ only search caught.net

OR
**Search Rhode Island Criminal Database**

**Caught.Net**   **Pro Se Way**   **Handling Bad Judges**   **"Secret" Canons**   **Trial Handbook**

**Bad Judges List**   **Bad Lawyers List**   **Legal Abuse Syndrome**   **Aggrieved Citizens List**

This is your conscience. Help this site by donating!
**Donate online NOW**
Due to volume, we only deal with electronic communications now (**email**).

-- ADVERTISEMENT --

Is Gay Prejudice Taught In The Bible?   Tithing - Fact vs. Fiction